**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Rivko Knox,<br><br>    Plaintiff,<br><br>v.<br><br>Mark Brnovich,<br><br>    Defendant. | No. CV-18-02089-PHX-DLR<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING INJUNCTIVE RELIEF** |

Plaintiff Rivko Knox challenges the constitutionality of Arizona Revised Statute ("A.R.S.") § 16-1005(H), as amended in 2016 by Arizona House Bill 2023 (hereinafter referred to as "H.B. 2023"), pursuant to 42 U.S.C. § 1983.[1] Knox contends that H.B. 2023—which makes it a felony for anyone other than the voter to possess that voter's early ballot, unless the possessor falls within a statutorily enumerated exception—is preempted by federal laws regulating the carriage and delivery of mail, violates the First Amendment to the United States Constitution, and is unconstitutionally vague. She seeks an order enjoining Defendant Arizona Attorney General Mark Brnovich from implementing or enforcing H.B. 2023.

Knox initiated this action on July 3, 2018, concurrently filing a complaint and a

---

[1] Section 1983 creates a cause of action against any person who, under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution and laws of the United States. *Long v. Cty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). Section 1983 is not a source of substantive rights but merely a method for vindicating federal rights established elsewhere. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

motion for a preliminary injunction. (Docs. 1-2.) In her preliminary injunction motion, Knox requested both expedited relief and consolidation of the preliminary injunction hearing with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). After conferencing with the parties telephonically on July 11, 2018, the Court granted Knox's request to expedite and consolidate the preliminary injunction hearing with the trial on the merits because this case presents pure questions of law and no factual disputes. In lieu of standard case management procedures, the Court set a briefing and hearing schedule on Knox's preliminary injunction motion, which functionally became an opening trial brief. (Doc. 10.)

On August 10, 2018, the Court conducted a consolidated preliminary injunction hearing and bench trial (hereinafter "consolidated hearing"). (Doc. 22.) Having considered the parties' briefs and presentations during the consolidated hearing, and for the following reasons, the Court finds in favor of Brnovich and against Knox on all claims.[2]

---

[2] At the conclusion of the consolidated hearing, Knox orally moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). Specifically, Knox requested that the Court accept as true the factual allegations in her complaint and dismiss Brnovich's affirmative defenses because Brnovich did not file an answer. (Doc. 26 at 82-83.) Knox's oral motion is denied because it is unnecessary and not well-taken.

The motion is unnecessary because the parties agree that the facts relevant to the Court's decision are undisputed. Brnovich conceded during the consolidated hearing that he does not dispute any of the factual allegations in Knox's complaint; he merely disagrees with Knox's interpretation and application of law to those facts. (*Id.* at 88-89.) This also is true for the facts relevant to Brnovich's affirmative defenses. No party disputes when Knox learned about H.B. 2023, when she opposed it, how long she has desired to collect and deliver voters' early ballots, or how long she waited after H.B. 2023 took effect to bring this lawsuit. The parties merely disagree over how the law should apply to those facts.

The motion is not well-taken because, in consolidating the preliminary injunction hearing with the trial on the merits and setting a corresponding briefing schedule, the Court intended to replace the Federal Rules' default case management procedures with a more expeditious, streamlined process that would ensure the "just, speedy, and inexpensive" resolution of this case before the August 28, 2018 primary election. Fed. R. Civ. P. 1. Requiring Brnovich to file a formal answer or responsive pleading would have served no useful purpose, considering both that the complaint's factual allegations are admittedly undisputed, and that the Court consolidated the preliminary injunction hearing with the trial on the merits at Knox's urging and in order to accommodate her request for expedited relief. Further, Knox was on adequate notice of Brnovich's affirmative defenses, this case was not tried by ambush, and Knox has suffered no prejudice by the absence of a formal responsive pleading. Instead, by eschewing the formalities of standard civil litigation in lieu of a simple briefing schedule, all parties saved time and expense in obtaining resolution of a case that, at its core, presents pure questions of law.

## I. Background

In addition to traditional, in-person voting on Election Day, Arizona permits no-excuse early voting, both in-person and via mail, during the 27 days before an election. A.R.S. § 16-541. "In 2007, Arizona implemented permanent no-excuse early voting by mail, known as the Permanent Early Voter List ('PEVL'). Arizonans now may vote early by mail either by requesting an early ballot on an election-by-election basis, or by joining the PEVL, in which case they will be sent an early ballot as a matter of course no later than the first day of the 27-day early voting period." *Democratic Nat'l Comm. v. Reagan*, -- F. Supp. 3d --, 2018 WL 2191664, at *7 (D. Ariz. May 10, 2018) (citing A.R.S. §§ 16-542, -544) (hereinafter "*DNC*"). To be counted, however, an early ballot must be received by the county recorder by 7:00 p.m. on Election Day. A.R.S. § 16-548(A). "Early ballots contain instructions that inform voters of the 7:00 p.m. deadline. Voters may return their early ballots by mail postage-free, but they must mail them early enough to ensure that they are received by this deadline." *DNC*, 2018 WL 2191664, at *7.

Knox is a Democratic Precinct Committeeperson ("PC") and a member of the League of Women Voters of Arizona ("LWVAZ"). (Doc. 1 ¶ 17.) A substantial part of Knox's community involvement is door-to-door canvassing. (¶ 18.) When Knox canvasses, she often encourages voters to complete and mail their early ballots. (¶ 20.) Before the 2016 election cycle, Knox collected and delivered ballots on behalf of voters she met while canvassing and who requested such service. (¶¶ 21-22.)

In 2016, however, Arizona enacted H.B. 2023, which limits who may collect a voter's voted or unvoted early ballot as follows:

> H. A person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony. An election official, a United States postal service worker or any other person who is allowed by law to transmit United States mail is deemed not to have collected an early ballot if the official, worker or other person is engaged in official duties.
>
> I. Subsection H of this section does not apply to:
>
> 1. An election held by a special taxing district formed

> pursuant to title 48 for the purpose of protecting or providing services to agricultural lands or crops and that is authorized to conduct elections pursuant to title 48.
>
> 2. A family member, household member or caregiver of the voter. For the purposes of this paragraph:
>
> (a) "Caregiver" means a person who provides medical or health care assistance to the voter in a residence, nursing care institution, hospice facility, assisted living center, assisted living facility, assisted living home, residential care institution, adult day health care facility or adult foster care home.
>
> (b) "Collects" means to gain possession or control of an early ballot.
>
> (c) "Family member" means a person who is related to the voter by blood, marriage, adoption or legal guardianship.
>
> (d) "Household member" means a person who resides at the same residence as the voter.

A.R.S. § 16-1005(H)-(I). "Voters therefore may entrust a caregiver, family member, household member, mail carrier, or elections official to return their early ballots, but may not entrust other, unauthorized third parties to do so." *DNC*, 2018 WL 2191664, at *8. Knox actively opposed H.B. 2023, testifying against the measure on behalf of LWVAZ. (Doc. 26 at 71.)

Since H.B. 2023's enactment, Knox has not offered to collect or deliver another person's early ballot, even if someone asks her for such assistance, because she understands that she now is "prohibited from collecting and delivering another person's early ballot." (Doc. 1 ¶ 24; Doc. 1-1 ¶ 10.) Knox plans to canvass during the 2018 election cycle, but in the absence of a court order enjoining enforcement of H.B. 2023, she will not offer or engage in ballot collection services. (Doc. 1 ¶¶ 32, 57.)

**II. Legal Standard**

Although Knox's motion seeks a preliminary injunction, the standards governing the issuance of a permanent injunction now govern because the Court granted Knox's request to consolidate the preliminary injunction hearing with the trial on the merits. Before the Court may grant a permanent injunction, Knox must succeed on the merits of at least one of her claims and also prove:

- 4 -

> (1) that [she] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

**III. Discussion**

  **A. Preemption**

  "A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); U.S. Const. Art. VI, cl. 2. When presented with a preemption question, the Court's task "is to ascertain Congress' intent in enacting the federal statute at issue." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983). "Congress' intent to preempt state and local law may be explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (internal quotations and citation omitted).

  "Where the intent of a statutory provision that speaks expressly to the question of preemption is at issue," the Court does "not invoke any presumption against pre-emption but instead focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Atay v. Cty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (internal quotations and citation omitted). In the absence of an express preemption provision, however, "a state law is preempted if it actually conflicts with federal law or if federal law so thoroughly occupies a legislative field that it is unreasonable to infer that Congress intended for supplemental state or local regulation." *Id.* Field preemption occurs when Congress "create[s] a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (internal quotations and citation omitted). "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal

standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012). Thus, "[w]here Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.* Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility, . . . and in those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]" *Id.* at 400 (internal quotations and citations omitted).

Knox's preemption challenge derives from Congress' plenary power to establish post offices. U.S. Const. art I, § 8, cl. 7. "The power possessed by Congress embraces the regulation of the entire Postal System of the country," including "the designation of the routes over which the mail shall be carried," "the offices where letters and other documents shall be received to be distributed or forwarded," "the carriage of the mail," "what shall be carried . . . [and] what shall be excluded," and "all measures necessary to secure its safe and speedy transit, and the prompt delivery of its contents." *Ex parte Jackson*, 96 U.S. 727, 732 (1878). "Not surprisingly, Congress has established a detailed statutory and regulatory scheme to govern this country's vast postal system." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 122-23 (1981).

The "linchpin" in this regulatory scheme is series of provisions called the Private Express Statutes ("PES"), which principally are "concerned with maintaining an effective, financially viable Postal Service." *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 891 F.2d 304, 310 (D.C. Cir. 1989), *reversed on other grounds by Air Courier Conference of Am. v. Am. Postal Workers Union, AFL-CIO*, 498 U.S. 517 (1991); *see* 18 U.S.C. §§ 1693-1699. The PES "historically have granted to the [United States Postal Service ("USPS")] a monopoly over the carriage of letters by prohibiting, with certain exceptions, private competition in conveying letters over postal routes." *Am. Postal Workers Union*, 891 F.2d at 306.

> The monopoly was created by Congress as a revenue protection measure for the Postal Service to enable it to fulfill its mission. It prevents private competitors from offering service on low-cost routes at prices below those of the Postal

> Service, while leaving the Service with high-cost routes and insufficient means to fulfill its mandate of providing uniform rates and service to patrons in all areas, including those that are remote or less populated.

*Air Courier Conference*, 498 U.S. at 519 (internal citations omitted).

As a practical matter, the PES accomplish this goal by attaching criminal penalties to the establishment of "any private express for the conveyance of letters or packets," without permission from the Postal Service. 18 U.S.C. § 1969(a). For example, "[s]ervices like UPS and Federal Express operate pursuant to an exception to the monopoly which allows private carriers to provide services for 'extremely urgent letters.'" *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 485 (2d Cir. 2009).

At issue here are certain other exceptions to the PES. Under the so-called "Private Hands" exception, the PES's criminal penalties "shall not prohibit the conveyance or transmission of letters or packets by private hands without compensation[.]" 18 U.S.C. § 1696(c). That is, "the sending or carrying of letters without compensation is permitted." 39 C.F.R. § 310.3(c). Similarly, under the so-called "Carriage Prior or Subsequent to Mailing" exception, the PES's criminal penalties "shall not prohibit any person from receiving and delivering to the nearest post office, postal car, or other authorized depository for mail matter any mail matter properly stamped." 18 U.S.C. § 1696(a). Instead, "[t]he private carriage of letters which enter the mail stream at some point between their origin and their destination is permissible." 39 C.F.R. § 310.3(e). Private parties therefore may carry letters to the post office or a mail depository to be mailed, and from the post office or mail depository to a recipient after they have been delivered, without running afoul of the PES.

Knox argues that early ballots, once completed and sealed in the appropriately addressed envelope, qualify as letters under federal law, *see* 39 C.F.R. §310.1(a)(1), and therefore become subject to federal laws regulating the carriage and delivery of mail. Accordingly, Knox contends that H.B. 2023 is preempted because it prohibits certain private parties from doing that which the aforementioned exceptions to the PES otherwise

- 7 -

would allow: namely, providing gratuitous private letter delivery services or carrying letters prior or subsequent to mailing. Knox's preemption challenge is not based on an express preemption provision in the relevant federal postal laws. Instead, her challenge is predicated on field and conflict preemption principles. With respect to conflict preemption, Knox does not argue that it is impossible to comply with both H.B. 2023 and the PES exceptions. Rather, she contends that H.B. 2023 presents an obstacle to the full purpose and intent of the federal postal scheme.

As a preliminary matter, the Court agrees with Knox that an early ballot, once completed and appropriately addressed, satisfies the federal definition of "letter" and therefore becomes mailable matter, meaning such ballots may enter the federal mail stream if the sender wishes to utilize the USPS. Additionally, "[t]here is little doubt that the federal statutory scheme for handling, delivering and sorting the mails is comprehensive." *Conte & Co., Inc. v. Stephan*, 713 F. Supp. 1382, 1386 (D. Kan. 1989). But the Court finds little evidence that Congress, in codifying the aforementioned exceptions to the PES, intended to foreclose state laws like H.B. 2023. Nor does the Court find that these exceptions to the PES are so integral to the federal scheme that supplemental state regulation stands as an obstacle to the accomplishment of Congress' full objectives.

Legislative history on the purpose behind these exceptions is sparse. Knox cited two documents touching on the subject. First, in 1979, Louis A. Cox, General Counsel for the USPS, testified before the House Subcommittee on Post Office and Civil Service regarding the purposes and interpretation of the PES. *Hearing Before Subcomm. on Postal Operations and Servs.*, 96 Cong. 11-32 (1979) (Statement of Louis A. Cox, USPS General Counsel). While summarizing the exceptions to the postal monopoly, Cox remarked: "You can always take a friend's letter down the street as a friendly gesture without running afoul of the [PES]." *Id.* at 12. But Cox's testimony merely acknowledges the existence of the Private Hands exception; it does nothing to elucidate Congress' intent in codifying it.

Second, on July 9, 1935, Matthew F. McGuire, a Special Attorney of the Department of Justice, testified before the House Subcommittee on the Post Office and Post Roads regarding the history, purposes, and proper interpretation of the PES. *Hearing Before Subcomm. on Postal Office and Postal Roads*, 74 Cong. 10-13 (1935) (Statement of Matthew F. McGuire, Special Attorney, Dep't of Justice), *available at* (Doc. 25-1 at 12-15). When speaking about the Private Hands exception, McGuire stated the following:

> The history of that particular exception is interesting. It was at a time when post roads had not been established except between the larger cities in the country, and as a consequence, some man living far off a post road, might want to send a letter or a message to some other individual not on a post road. The Congress wanted to give him authority or the right to send a communication to his friend by private hands. As the country developed, post roads were established everywhere, and that exception was carried down with that limitation placed upon it, and it is still possible to send a message by private hands without compensation.

*Id.* at 11-12. It therefore appears that the Private Hands exception was intended to address a problem—delivery of letters to or from areas far away from a post road—that had diminished by 1935 because, by then, "post roads were established everywhere."

Viewing these exceptions in the broader context of the PES, Congress did not intend to preempt state laws such as H.B. 2023. As previously explained, the PES were enacted to ensure that the USPS remained financially viable and capable of servicing all areas at a uniform rate. Knox herself acknowledges that, "[f]rom its inception, the monopoly granted the USPS had always been limited to the carriage of mail 'for hire.'" (Doc. 2 at 4.) Accordingly, the field Congress intended to occupy was the carriage of mail *for hire*. By carving out the aforementioned exceptions to the otherwise applicable postal monopoly, Congress evinced an intent *not* to comprehensively regulate this area because gratuitous, private delivery of a letter or the carriage of letters prior or subsequent to mailing are activities that do not meaningfully affect the financial viability of the USPS. Congress did not intend to supplant state control over the handling of early ballots simply because it exempted from the criminal penalties associated with competing

with the federal government's postal monopoly activities that would not normally affect the USPS's operations.[3]

To the contrary, the Supreme Court has long stated that "the limits of state regulatory power in relation to the federal mail service involve situations where state regulation involved a direct, physical interference with federal activities under the postal power or some direct, immediate burden on the performance of the postal functions." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 95-96 (1945); *see also Roth v. United States*, 354 U.S. 476, 493-94 (1957). Consistent with this understanding, courts have found that the USPS is exempt from compliance with state laws that interfere with the USPS's operations. *See, e.g., United States v. City of Pittsburg, Cal.*, 661 F.2d 783, 785-86 (9th Cir. 1981) (lawn-crossing ordinance); *U.S. Postal Serv. v. Town of Greenwich*, 901 F. Supp. 500, 505 (D. Conn. 1995) (permit fees); *Middletown Twp. v. N/E Reg'l Office*, 601 F. Supp. 125, 127-28 (D.N.J. 1985) (zoning regulations). In contrast, courts have rejected preemption challenges to state laws that implicated mailed or mailable materials or incidentally touched upon the mail, but did not burden or impede the USPS's ability to carry out its duties. *See, e.g.*, *Roth*, 354 U.S. at 493-94 (holding that California obscenity statute was not preempted by federal law prohibiting the mailing of obscene material because the state law did not burden or interfere with the federal postal functions); *Syndicated Pub'ns v. Montgomery Cty.*, 921 F. Supp. 1442, 1447-48 (D. Md. 1996) (same with respect to state deceptive trade practices law applied to mailed solicitations); *Conte*, 713 F. Supp. at 1384-87 (consumer protection statute); *Consigned Sales Co., Inc. v. Sanders*, 543 F. Supp. 230, 233 (W.D. Okla. 1982) (state fireworks regulations); *State v. Reader's Digest Ass'n, Inc.*, 527 S.W.2d 355, 361-62 (Mo. 1975) (lotteries); *State v.*

---

[3] Notably, Arizona is not the only state that has enacted limitations on who may collect a voter's early ballot. *See, e.g.*, Ind. Code § 3-14-2-16(4); Conn. Gen. Stat. § 0-140b(a); N.M. Stat. Ann. § 1-6-10.1; Ga. Code Ann. § 21-2-385(a); Mo. Rev. Stat. § 115.291(2); Nev. Rev. Stat. § 293.330(4); N.C. Gen. Stat. § 163A-1310(b)(1); Ohio Rev. Code. Ann. § 3509.05(A); Tex. Elec. Code Ann. § 86.006(a). None of these laws have been found to be preempted by the exceptions to the PES, let alone challenged on that basis. Indeed, the Court has found no case that has sustained a preemption challenge based on the PES exceptions at issue here, underscoring the novelty of Knox's theory.

*McHorse*, 517 P.2d 75, 79-80 (N.M. Ct. App. 1973) (drug-distribution).

Knox has not cited and the Court has not found a single case in which a court has sustained a preemption challenge to a state law implicating mailed or mailable matter, but not directly burdening or interfering with the operations of the USPS. Nor has Knox cited authority for the proposition that private individuals become part of the federal postal functions simply by carrying an item that could, in theory, enter the federal mail stream if deposited with the USPS. The Court therefore concludes that H.B. 2023 is not preempted by federal postal laws because the law "does not impinge on federal mail service or the power of the government to conduct it." *Conte*, 713 F. Supp. at 1384.

## B. First Amendment[4]

Knox next argues that H.B. 2023 burdens her First Amendment rights. Her First Amendment claim takes two forms. First, she argues that H.B. 2023 constitutes a speech restriction because it regulates the use and delivery of mail. (Doc. 2 at 12.) Second, Knox asserts that H.B. 2023 regulates "speech-facilitating conduct." (Doc. 15 at 9.) That is, Knox contends that the act of collecting and delivering a voter's completed early ballot is protected by the First Amendment because it facilitates the communication of the voter's message, and because, in deciding whose ballots to collect, Knox herself communicates a message. (*Id.* at 9-10.)

As the party invoking the First Amendment's protections, Knox bears the burden of proving that those protections apply to the conduct at issue. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). The Court concludes they do not.

With respect to Knox's first assertion—that H.B. 2023 constitutes a speech restriction because it regulates the use and delivery of mail—she cites no case, and the Court has found none, holding that an individual has a First Amendment right to provide gratuitous letter delivery services to third parties. Rather, the mail-as-speech cases that Knox relies on all concern restrictions on a person's ability to send or receive her own

---

[4] Because Knox challenges a state law, her claim technically arises under the Fourteenth Amendment, which applies the First Amendment's protections against states and their political subdivisions. *See City of Ladue v. Gilleo*, 512 U.S. 43, 45 n.1 (1994).

mail through the USPS. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983); *Blout v. Rizzi*, 400 U.S. 410 (1971); *Currier v. Potter*, 379 F.3d 716 (9th Cir. 2004). H.B. 2023 does not restrict access to the USPS; it merely limits the categories of private individuals within Arizona's borders who can provide a gratuitous service outside the federal mail stream.

To the extent Knox argues that providing ballot collection services is, in and of itself, an activity protected by the First Amendment, her first theory dovetails with her second. Indeed, during the consolidated hearing, Knox readily admitted that "the core of [her] claim is that [ballot collection] is speech-facilitating conduct . . . protected by the First Amendment." (Doc. 26 at 31.) But the Court sees no meaningful difference between the "speech-facilitating conduct" theory presented here, and the contention that ballot collection is an inherently expressive activity, which the Court recently rejected in the context of *DNC*.

As the Court explained in that case:

> Conduct, such as collecting a ballot, is not "speech" for purposes of the First Amendment simply because "the person engaging in the conduct intends thereby to express an idea." *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968). Rather, the First Amendment extends "only to conduct that is inherently expressive." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006). The Court . . . find[s] persuasive the Fifth Circuit's opinion in *Voting for Am. v. Steen*, 732 F.3d 382 (5th Cir. 2013), which considered a challenge to various Texas laws that regulated the receipt and delivery of completed voter registration applications. The Fifth Circuit rejected the argument that collecting and delivering voter registration applications were inherently expressive activities protected by the First Amendment. *Id.* at 392. In doing so, the court agreed that "some voter registration activities involve speech—'urging' citizens to register; 'distributing' voter registration forms; 'helping' voters fill out their forms; and 'asking' for information to verify registrations were processed successfully." *Id.* at 389. It determined, however, that "there is nothing inherently expressive about receiving a person's completed [voter registration] application and being charged with getting that application to the proper place." *Id.* at 392 (internal quotation and citation omitted). Likewise, though many [get-out-the-vote] activities involve First Amendment protected activity, there is nothing inherently expressive or communicative about collecting a voter's completed early ballot and delivering it to the proper place.

*DNC*, 2018 WL 2191664, at *17. Nothing in Knox's briefing or presentation at the consolidated hearing leads the Court to deviate from the conclusion it reached on the substantially similar claim raised in *DNC*. Knox's First Amendment claim therefore fails because the act of collecting and delivering to the appropriate destination a voter's completed early ballot is not itself an inherently expressive activity.[5]

**C. Vagueness**

Lastly, Knox contends that H.B. 2023 is unconstitutionally vague "because its definition of when a person is deemed not to have collected an early ballot is excessively vague and incapable of being predictably or consistently applied." (Doc. 2 at 13.) A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304

---

[5] Moreover, even assuming that H.B. 2023 implicates protected speech, its affects are minimal. As the Court noted in *DNC*:

> Nothing in H.B. 2023 prevents [someone] from encouraging, urging, or reminding people to vote, informing and reminding them of relevant election deadlines, helping them fill out early ballots or request special election boards, or arranging transportation to on-site early voting locations, post offices, county recorder's offices, or polling places. *See* [*Voting for Am.*, 732 F.3d] at 393 (noting that voter registration volunteers remained "free to organize and run the registration drive, persuade others to register to vote, distribute registration forms, and assist others in filling them out"); *League of Women Voters of Fla. v. Browning*, 575 F.Supp.2d 1298, 1322 (S.D. Fla. 2008) ("[The challenged law] does not place any restrictions on who is eligible to participate in voter registration drives or what methods or means third-party voter registration organizations may use to solicit new voters and distribute registration applications. Instead, [it] simply regulates an administrative aspect of the electoral process—the handling of voter registration applications by third-party voter registration organizations after they have been collected from applications."). H.B. 2023 merely regulates who may possess, and therefore return, another's early ballot.

*DNC*, 2018 WL 2191664, at *17. Likewise, nothing about the law precludes Knox from communicating to voters the importance of voting and participating in the democratic process, or informing them of the myriad ways in which they can return their early ballots. Nor does the law prevent voters from accessing the USPS or returning their ballots through certain statutorily authorized proxies.

(2008). "Vague statutes are invalidated for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of laws based on arbitrary and discriminatory enforcement by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Humanitarian Law Project v. Mukasey*, 552 F.3d 916, 928 (9th Cir. 2009) (internal quotations and citation omitted), *affirmed in part, reversed in part, and remanded on other grounds by* 561 U.S. 1.

Knox's vagueness argument centers on H.B. 2023's exception for "other person[s] who [are] allowed by law to transmit United States mail," when "engaged in official duties." A.R.S. § 16-1005(H). She contends that the law is vague because it does not define these phrases. As it pertains to her, specifically, Knox states that she believes the exceptions to the PES allow her to "transmit United States mail," but does not know what is meant by "engaged in official duties." Knox points to her role as a Democratic PC and notes that, under Arizona law, "[t]he minimum duties of a [PC] shall be to assist the [PC's] political party in voter registration and to assist the voters of that political party to vote on election days." A.R.S. § 16-822(E). Because Knox believes ballot collection is an important method of assisting voters, she contends that she might reasonably fall within H.B. 2023's exceptions, but nonetheless fears prosecution because, in her view, the law does not adequately define when someone is allowed by law to transmit mail as part of her official duties.

The Court concludes that H.B. 2023 is not unconstitutionally vague. A person of ordinarily intelligence can comprehend what the law prohibits and what it allows. With respect to Knox, although nothing in the PES prohibits her from gratuitously carrying letters for others, or from carrying letters prior or subsequent to mailing, nothing in federal law allows her to transmit mail once it has entered the federal mail stream. Moreover, even assuming that the PES's exceptions authorize her to "transmit United States mail," as opposed to simply carrying potentially mailable matter (i.e., letters) outside the federal mail stream, there is no evidence that Knox's official duties as a PC

- 14 -

include the transmission of mail. Section 16-822(E) requires PC's to assist voters on Election Day; it does not require PC's to carry mail. Any ambiguity results from the way in which A.R.S. § 16-822(E) describes the role of a PC and how liberally Knox interprets that role, rather than vagueness in H.B. 2023 itself. Moreover, Knox admittedly understands that she now is "prohibited from collecting and delivering another person's early ballot." (Doc. 1 ¶ 24; Doc. 1-1 ¶ 10.) She cannot credibly claim that H.B. 2023 will punish her for behavior she could not have known is illegal when she readily acknowledges that she understands her conduct would be prosecuted under the law.

The Court also finds that H.B. 2023 is not especially susceptible to arbitrary and discriminatory enforcement, or that it will chill the free exercise of First Amendment freedoms. To the first point, Knox argues that H.B. 2023 authorizes subjective, arbitrary enforcement because the Maricopa County Attorney recently issued a statement reminding county residents that "anyone who may be planning to engage in ballot harvesting for this Primary Election and General Election," risks committing "a class 6 felony . . . unless you are a family member, household member, or caregiver of the voter to whom the ballot was issued," but omitting reference to the exception for other persons allowed by law to transmit mail in the course of their official duties. (Docs. 15 at 12, 15-1.) The Court does not find a likelihood of arbitrary or discriminatory enforcement simply because one Arizona county attorney's office issued a statement that perhaps was not as comprehensive as it could have been.

As to the second point, the Court has concluded (twice now) that ballot collection is not an inherently expressive activity subject to the First Amendment's protections. Accordingly, enforcement of H.B. 2023 does not risk chilling the free exercise of First Amendment freedoms. Knox's vagueness challenge therefore is rejected.

**D. Brnovich's Affirmative Defenses**

Because the Court rejects Knox's constitutional claims on their merits, it need not address Brnovich's affirmative defenses based on laches and the Supreme Court's decision in *Purcell v. Gonzalez*, 549 U.S. 1 (2006), which has been interpreted to

discourage courts from issuing orders changing a state's electoral rules too close to an election. Nonetheless, the Court will comment briefly on these matters.

Neither laches nor *Purcell* bars Knox from litigating the merits of her claims, or from eventually obtaining relief if those claims proved successful. At most, laches and *Purcell* might affect Knox's ability to obtain expedited relief. That is, because Knox waited until the start of the 2018 election cycle to bring these claims, laches and *Purcell* might counsel against enjoining H.B. 2023 prior to the 2018 primary or general elections. *See Ariz. Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 925 (D. Ariz. 2016) (applying laches to bar only the plaintiffs' request for emergency relief, but allowing the case to continue on the merits because the challenged practice "will continue to apply in future elections if it is not invalidated by a court or revised by the Legislature"). But to the extent Brnovich argues these doctrines require dismissal of Knox's claims, his argument is not well-taken.

With that said, the timing of this lawsuit is not optimal. Arizona enacted H.B. 2023 in 2016. Knox knew about the law at that time and actively opposed its passage. Knox also engaged in ballot collection prior to H.B. 2023's passage and has desired to do so since. She therefore could have challenged H.B. 2023 at any point after its passage, including by intervening in the *DNC* litigation or bringing a lawsuit at any point in 2017, when no statewide elections were scheduled. An earlier challenge would have provided the parties and the Court with more time to consider these important constitutional questions, afforded time for appellate review, and allowed Arizona to respond to or implement any resulting court orders prior to the start of a statewide election season. *See Id.* at 923 (highlighting the prejudice that delayed filings work on the administration of justice, particularly by rushing judicial decision making). Though the timing of this lawsuit resulted not from bad faith, but from Knox's mistaken belief that she could not challenge H.B. 2023 while another case (*DNC*) was pending, her decision to bring it mere weeks before the start of statewide early voting needlessly created an exigency that could have been avoided had the lawsuit been filed prior to the cusp of the 2018 election

season.

## IV. Conclusion

For these reasons, the Court concludes that H.B. 2023 is not preempted by the exceptions to the PES, does not violate Knox's First Amendment rights, and is not unconstitutionally vague.

**IT IS ORDERED** as follows:

1. Knox's oral motion for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c) is **DENIED** as moot.

2. Knox's motion for preliminary injunction (Doc. 2) is **DENIED**.

3. The Court finds in favor of Brnovich and against Knox on all claims. The Clerk of the Court shall enter judgment accordingly and terminate this case.

Dated this 24th day of August, 2018.

Douglas L. Rayes
United States District Judge